# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

THOMAS R.,[1]

                         Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security,

                        Defendant.

Case No. 4:20-CV-00003-TMB

## DECISION AND ORDER

On September 30, 2014, Thomas R. ("Plaintiff") protectively filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning January 1, 2008.[3] Plaintiff has exhausted his administrative remedies and filed a Complaint seeking relief from this Court.[4] Plaintiff's opening briefs ask the Court to reverse and remand the agency's decision for a de novo hearing and a

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brought claims under Title II and Title XVI. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 227.

[4] Docket 2 (Plaintiff's Compl.).

new decision.[5]  The Commissioner filed an Answer and a briefs in opposition to Plaintiff's

opening briefs.[6]  Plaintiff filed reply briefs on June 26, 2020 and October 2, 2020.[7]  Oral

argument was not requested and was not necessary to the Court's decision.  This Court

has jurisdiction to hear an appeal from a final decision of the Commissioner of Social

Security.[8]  For the reasons set forth below, Plaintiff's request for relief will be denied.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned

unless it is either not supported by substantial evidence or is based upon legal error.[9]

"Substantial evidence" has been defined by the United States Supreme Court as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than

a preponderance."[11]   In reviewing the agency's determination, the Court considers the

evidence in its entirety, weighing both the evidence that supports and that which detracts

---

[5] Dockets 12, 18 (Plaintiff's Br.).

[6] Docket 10 (Answer); Dockets 13, 19 (Defendant's Br.).

[7] Dockets 14, 20 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 2 of 46

from the administrative law judge ("ALJ")'s conclusion.[12] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16] In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[17]

## II. DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 3 of 46

physical or mental disability.[18]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23]  If a claimant establishes a

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 4 of 46

prima facie case, the burden of proof then shifts to the agency at step five.[24]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity."[26]  *The ALJ determined that Plaintiff had not engaged in substantial activity during the period from his alleged onset date of January 1, 2008 through his date last insured of December 31, 2012.*[27]

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[28]  *The ALJ determined that Plaintiff had the following severe impairments: mild cognitive disorder and cardiovascular insult to the brain.  The ALJ determined that Plaintiff's depressive and anxiety disorders were not medically determinable impairments.  The ALJ noted that, in the alternative, Plaintiff's depression*

_____

(9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[27] A.R. 557.

[28] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 5 of 46

*and anxiety were non-severe. The ALJ also determined that Plaintiff's history of aortic valve replacement surgeries, asthma, and obesity were non-severe impairments.*[29]

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[30] *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.*[31]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[32] *The ALJ determined that the Plaintiff would have had the residual functional capacity to perform light work except the Plaintiff was limited to frequent climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; and no exposure to unprotected heights and hazardous*

---

[29] A.R. 558–59.

[30] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[31] A.R. 559.

[32] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 6 of 46

*machinery. The ALJ further limited Plaintiff to simple, routine, and repetitive tasks and no assembly line type work.[33]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[34] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that Plaintiff would be unable to perform any past relevant work.[35]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[36] *The ALJ determined that, through the date insured, there would be a significant number of jobs in the national economy that the Plaintiff could perform, including ticket taker, parking lot attendant, and rental storage clerk.[37]*

---

[33] A.R. 561.

[34] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[35] A.R. 568.

[36] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[37] A.R. 569.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 7 of 46

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged onset date of January 1, 2008 through December 31, 2012, the date last insured.[38]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1962.[39]  Plaintiff reported working until 2008.  He reported last working at a home improvement store as a sales associate.  In the past, he reported working as a painter and construction worker and as a construction project manager, project engineer, and project estimator.[40]  On or about January 22, 2015, the Social Security Administration ("SSA") initially determined that Plaintiff was not disabled under the applicable rules.[41]  Plaintiff attended hearings held on November 16, 2015, and March 28, 2016, before Administrative Law Judge ("ALJ") LaCara.[42]  The ALJ issued an unfavorable ruling on May 4, 2016.[43]  The Appeals Council denied Plaintiff's request for review on August 14, 2017.[44]  This Court reversed and remanded the case to the SSA for further administrative proceedings on November 8, 2018.[45]

---

[38] A.R. 570.

[39] A.R. 227.

[40] A.R. 272, 238, 317, 568, 619–21, 805.

[41] A.R. 95.

[42] A.R. 27, 48–82.

[43] A.R. 27–40.

[44] A.R. 1–5.

[45] A.R. 685–711.

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 8 of 46

In its remand order of February 1, 2019, the Appeals Council specifically noted that "[t]he electronic record has two audio recordings for the November 16, 2015, hearing but both of them are incomplete. One of the recordings has no audio at all and the second one only has two minutes of audio, but the hearing notes indicate the hearing lasted for about 10 minutes." The Appeals Council then ordered that "an attempt should be made to locate and upload the complete hearing recording for the November 16, 2015 hearing." The Appeals Council also ordered the ALJ to bring evidence related to Plaintiff's prior 2012 claim into the record and consider it in the decision.[46]

Plaintiff appeared and testified at a hearing after remand on October 10, 2019.[47] The ALJ issued another unfavorable decision on November 15, 2019.[48] In her decision, ALJ LaCara noted that the November 2015 audio recording "was unable to be located."[49] Plaintiff filed a Complaint seeking relief from this Court on January 17, 2020.[50] On May 29, 2020, Plaintiff filed a Motion to Vacate and Remand for Failure to Comply with Prior Court Remand.[51] On July 20, 2020, this Court ordered the parties to file briefs on the

---

[46] A.R. 555, 714–15.

[47] A.R. 618–28.

[48] A.R. 555–70.

[49] A.R. 555.

[50] Docket 2.

[51] Docket 12.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 9 of 46

merits.[52]  The parties filed briefs at Dockets 18, 19, and 20.  Plaintiff is represented by counsel in this appeal.[53]

*Medical Records and Medical Opinion Evidence*

The medical records and medical opinion evidence span from approximately December 2003 through September 2019.  However, the relevant time period for this litigation is limited to the alleged onset date of January 1, 2008 through December 31, 2012, the date last insured.[54]  Although the Court will focus on the time period between January 1, 2008 and December 31, 2012, the following are the relevant medical records[55] before January 1, 2008:

On December 17, 2003, Plaintiff underwent cardiac surgery to replace a recalled prosthetic aortic valve implanted in 1982.[56]

On February 8–9, 2006, Plaintiff saw Paul Craig, Ph.D., for a neuropsychological evaluation.  Dr. Craig conducted an interview and performed several neuropsychological tests.  Plaintiff reported that after his cardiac surgery in 2003 he noticed cognitive limitations and had not experienced "any significant improvement."  He reported short-term memory and organizational limitations.  On examination, Dr. Craig observed general

---

[52] Docket 15.

[53] Docket 1.

[54] A.R. 570.  Because Plaintiff was only insured for disability benefits through December 31, 2012, he must establish a disability on or prior to that date.  *See* 42 U.S.C. § 423(d)(1)(A).

[55] There are multiple duplicate treatment notes in the Court's record.  To the extent possible, the Court cites the first treatment note to appear in the medical record.

[56] A.R. 903–06.

intellectual ability in the superior range with a clinically significant discrepancy between verbal and nonverbal intellectual abilities. Dr. Craig noted that despite the discrepancy, Plaintiff was still functioning in the average to high-average range of nonverbal intellectual ability and superior range of verbal intellectual functioning. Plaintiff's sensory-perceptual examination was "well above average." Dr. Craig observed mild to moderate slowing in motor speed in the left hand, but he opined that Plaintiff "could be expected to use both hands satisfactorily for purposes of manipulating objects." He observed normal expressive and receptive language abilities and high-average general memory, but he observed average to low average incidental recall. However, Dr. Craig opined that "[o]verall, these findings do not point toward any dramatic deficit with regard to memory functioning." Dr. Craig also observed that Plaintiff performed in the "mildly slowed range" on some problem solving and executive function tests. Dr. Craig noted that Plaintiff's difficulty on certain tests "comport[ed] with his subjective complaint of having problems dealing with multitasking and organizational skills." Based on his evaluation, Dr. Craig recommended treatment for Plaintiff's depression, a "brief trial of cognitive rehabilitation," and for Plaintiff to consider "pursuit of employment in a more focused role that he can perform by rote."[57]

On March 12, 2007, Plaintiff saw Bruce Leuchter, M.D., at University Hospital of Columbia and Cornell in New York, to assess Plaintiff's neuropsychiatric status after cardiac surgery. Dr. Leuchter examined and evaluated Plaintiff, performed

---

[57] The Court notes that Page 9 of Dr. Craig's report is missing from the medical record. A.R. 932–40.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 11 of 46

neurobehavioral testing, reviewed Plaintiff's medical records, and reviewed past MRI scans with colleagues. Dr. Leuchter noted that his evaluation "revealed deficits in sustained attention, language function, and overall executive function." He opined that Plaintiff's performance was "inconsistent with his level of intelligence and with his performance on other subtests in the battery." Dr. Leuchter noted that Plaintiff's motor exam showed 4+/5 weakness in the left upper and lower extremities. He also noted that Plaintiff's multiple MRI brain scan images showed what he believed to be "metal embolic particles." Dr. Leuchter opined that the metal particles were "significantly contributing to [Plaintiff]'s . . . neuropsychiatric deficits." He opined that Plaintiff's "neuropsychiatric deficits [were] secondary both to the explant surgery in December of 2003 and the multiple embolic events sustained prior to the explant of the defective valve." Dr. Leuchter recommended that Plaintiff be followed closely by a neurologist over time.[58]

On March 21, 2007, Steven Harms, M.D., reviewed Plaintiff's CT and MRI examinations performed on March 9, 2007. Dr. Harms observed "a number of foci of magnetic susceptibility effect within the brain." He opined that the "right parietal lesions may be producing the left sided physical symptoms" and that "[t]his should be correlated by his neurologist with physical findings."[59]

On June 14, 2007, Plaintiff saw Ronald Martino, M.D., at Fairbanks Psychiatric & Neurological Clinic. He reported "difficulties with attention span and sequencing chores."

_____

[58] A.R. 907–11.

[59] A.R. 912.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 12 of 46

On physical examination, Dr. Martino observed that Plaintiff's motor exam was normal; his gait was normal; his deep tendon reflexes were +2 and symmetrical with flexor plantar responses, but his rapid alternating movements were slow and clumsy in the left hand; his strength was 4/5 in the left upper extremity and equivocally reduced at the left hip flexor; and he had truncal swaying. Dr. Martino started Plaintiff on Dexedrine to "improve the efficiency of his thinking."[60]

On June 18, 2007, Plaintiff followed up with Charles Steiner, M.D. at Tanana Valley Clinic for "multiple cerebral emboli (metallic) from his mech[anical] heart valve." He reported chronic cognitive deficits such as "poor short-term recall, impaired integration of learning, and left-sided weakness."[61]

On July 17, 2007, Plaintiff followed up with Dr. Martino. He reported continuing "difficulties with multi-tasking and sequencing," causing problems at work. Dr. Martino adjusted his medications by switching to Ritalin.[62]

On July 30, 2007, Plaintiff had a chest x-ray. The x-ray showed "[b]orderline cardiomegaly" and a minimally increased heart size "at the upper limit of normal."[63] Also on July 30, 2007, Plaintiff visited Sean Timmons, P.A.-C., at Tanana Valley Clinic. He reported chest pain and shortness of breath. On physical examination, PA Timmons

---

[60] A.R. 340–41.

[61] A.R. 358.

[62] A.R. 338–39.

[63] A.R. 359.

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 13 of 46

observed a regular heart rhythm and normal extremities, but an abnormal electrocardiogram (EKG) and minimal heart enlargement.[64]

On August 3, 2007, Plaintiff followed up with Dr. Steiner. He reported chest pain and light-headedness "while standing at work." Dr. Steiner noted that Plaintiff's stress echo test of August 1, 2007 was "negative for ischemia."[65]

On August 28, 2007, Plaintiff followed up with Dr. Martino. He reported that his speech had improved. Dr. Martino observed "some stammering, especially when the patient is anxious."[66]

On October 18, 2007, Plaintiff visited Dr. Martino. He reported having "significant difficulties organizing his thinking." Plaintiff reported that he lost track of his thoughts and would stop in the middle of a sentence, making a "significant impact both at work and in his social interactions." He reported that Valium did not help with speech, but it did prevent him from becoming frustrated. On physical examination, Dr. Martino observed that Plaintiff's speech was clear with "no evidence of dysarthria or aphasia." He noted that Plaintiff "frequently breaks off his sentences in the middle without finishing a thought. This makes his speech difficult to follow at times and occasionally leads to stammering." Plaintiff appeared anxious at the visit. He had a normal gait.[67]

------

[64] A.R. 356–57.

[65] A.R. 362.

[66] A.R. 337.

[67] A.R. 335–36.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 14 of 46

On November 5, 2007, Dr. Martino wrote a diagnostic summary and opinion letter on Plaintiff's behalf. Dr. Martino opined that Plaintiff was experiencing executive brain dysfunction which was "the direct result of his cardiac surgery." Dr. Martino opined that Plaintiff was totally and permanently disabled and he would never be able to return to his previous work. He opined that he was also "not at all confident that [Plaintiff would] be able to maintain his employment at Home Depot." He opined that Plaintiff's executive function and left-sided weakness were unlikely to resolve and he was "vulnerable to deterioration in his neuropsychological functioning in the future." Dr. Martino opined that Plaintiff would need a "prolonged period of neuropsychological rehabilitation" and "an indefinite period of counseling."[68]

On November 30, 2007, Plaintiff saw Dr. Martino. He reported that Valium helped "lower the stress" of working at Home Depot. On physical examination, Dr. Martino observed "many pauses in [Plaintiff's] speech" and that he had a "tendency not to finish sentences." Dr. Martino noted that Plaintiff was anxious, but his mood appeared to be "fairly normal."[69]

The following are the relevant records after January 1, 2008:

On January 29, 2008, Plaintiff followed up with Dr. Martino. He reported quitting his job because there was nothing to do at this time of year at Home Depot. Dr. Martino

---

[68] A.R. 329–34.

[69] A.R. 328.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 15 of 46

noted that Plaintiff's depression was in fair remission and that his speech was "very halting," but with no aphasic errors.[70]

On April 8, 2008, Plaintiff saw Dr. Martino. He reported that he was "under less stress" after stopping working at Home Depot, that Valium and Wellbutrin were keeping him "more stable," and that he went to Thailand since his last visit. On physical examination, Dr. Martino observed that Plaintiff's speech was clear "without dysarthria or aphasia," but that his speech had "a halting quality to it, but much less so than at the time of his last visit." Dr. Martino noted a normal mood and "mild to moderate anxiety."[71]

On July 8, 2008, Plaintiff followed up with Dr. Martino. He reported that he bought a lot next door and that he was "clearing it out and building a small house on it," but that he was "frustrated that work on the house [was] going slowly." Plaintiff reported that he and his family planned to travel to Thailand. He also reported taking very little Valium. Dr. Martino observed that Plaintiff's speech was "somewhat halting" and that he had difficulty organizing his thoughts, but he had "no aphasic errors." Dr. Martino noted that Plaintiff's mood was normal, but he was anxious.[72]

On September 16, 2008, Plaintiff followed up with Dr. Martino. He reported feeling nervous about his six-month trip to Thailand. Dr. Martino observed that Plaintiff's speech

---

[70] A.R. 326–27.

[71] A.R. 325.

[72] A.R. 324.

was clear, but that he did stammer. He noted that Plaintiff's mood was "mildly depressed." Dr. Martino continued his prescriptions for Wellbutrin and Valium.[73]

On September 29, 2009, Plaintiff followed up with Dennis Rogers, P.A.-C., at Tanana Valley Clinic. He reported travelling to Thailand in one month. He also reported that he had discontinued Wellbutrin "several months ago" and felt he was "doing well, busy, not depressed." On physical examination, PA Rogers observed Plaintiff had a regular heart rate and rhythm, his extremities were normal, he was alert and oriented, and had no "unusual anxiety or evidence of depression."[74]

On October 5, 2010, Plaintiff saw PA Rogers. He reported that he used Valium occasionally for "stress." He also reported that he was diagnosed with benign prostatic hyperplasia (BPH) in Thailand in May 2010. Plaintiff also requested starting back on Wellbutrin as it had a positive effect on his memory and Thai language skills. PA Rogers observed a regular heart rate and rhythm with no jugular vein distention (JVD) and normal extremities. He observed that Plaintiff was alert and oriented with no unusual anxiety or evidence of depression and that his coordination, balance, and gait were intact.[75]

On August 20, 2012, Plaintiff followed up with PA Rogers. He reported having a chest abscess removed while in Thailand. He reported that a bone scan showed no infection. On physical examination, PA Rogers observed a scar on Plaintiff's chest, but

---

[73] A.R. 323.

[74] A.R. 352–54.

[75] A.R. 347–51.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 17 of 46

"no sign of infection, not tender, healed well." He observed that Plaintiff was alert and oriented with "[g]rossly normal intellect;" his memory was intact; his fine motor skills were normal; and his balance, gait, and coordination intact, with no motor weakness. PA Rogers opined that Plaintiff's anxiety seemed "very situational" and not generalized, although his psychological evaluation in the past recommended a dose of Valium daily.[76]

On September 19, 2012, the agency's reviewing physician, Wandal Winn, M.D., opined that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and no episodes of decompensation.[77] On the same date, Paul Cherry, Ph.D., completed a Medical Consultant's Review of Psychiatric Review Technique Form. Dr. Cherry opined that Plaintiff's "ability to remember locations and work-like procedures, and his ability to ask simple questions and request assistance" were "not significantly limited." He opined that Plaintiff's ability to relate to the public was "moderately limited" and his ability to sustain an ordinary routine without special supervision was "not significantly limited." Dr. Cherry marked that he "agreed" with the DDS treating or examining source statements.[78]

The following are the relevant records after December 31, 2012:

On May 30, 2014, Plaintiff went to Fairbanks Memorial Hospital for "stroke symptoms," including aphasia and confusion. On examination, the attending physician

---

[76] A.R. 342–46.

[77] A.R. 646.

[78] A.R. 366–71.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 18 of 46

observed that Plaintiff was alert and attentive, but the physician observed expressive aphasia and 4/5 strength on the left side. Plaintiff's expressive aphasia resolved in the emergency room. An MRI showed "evidence of acute ischemia." He was given aspirin and released on May 31, 2014.[79]

On June 3, 2014, Plaintiff had an MRI. The MRI showed "[i]mprovement of left frontal and basal ganglia parenchymal hematoma with some interval resorption, now measuring 3.5 cm compared to 5.5 cm previously. Developing encephalomalacia. No midline shift or new hemorrhagic focus evident."[80]

On June 8, 2014, Plaintiff presented to the emergency department in Fairbanks with a severe headache and right sided weakness. He was transferred from Fairbanks Hospital to Providence ICU in Anchorage for a "[l]eft frontal intraparenchymal hemorrhage/hemorrhagic conversion of recent left basal ganglia ischemic infarct w[ith] midline shift" and cognitive deficits. Upon discharge, the attending physician observed that Plaintiff was pleasant, conversant, appropriate, and able to carry on a 4-point conversation. Plaintiff was discharged on June 15, 2014.[81]

On July 1, 2014, Plaintiff followed up with Dr. Steiner. On physical examination, Dr. Steiner observed a minimal right facial droop, normal level of consciousness,

---

[79] A.R. 475–90.

[80] A.R. 541.

[81] A.R. 373–459.

orientation, and memory. He observed normal balance, gait, coordination, and fine motor skills.[82]

On July 9, 2014, Plaintiff had a CT scan of the head. The CT showed "[i]mprovement of left frontal and basal ganglia parenchymal hematoma with some interval resorption. Developing encephalomalacia. No midline shift or new hemorrhagic focus evident."[83]

On August 14, 2014, Plaintiff saw Dr. Steiner. On physical examination, Dr. Steiner observed that Plaintiff was oriented to time, place, person, and situation. He had an appropriate mood and affect; normal insight; and normal memory, balance and gait. Dr. Steiner noted that Plaintiff's "[f]unctional capacity ha[d] improved significantly over [the] past month. I anticipate continued improvement but doubt he'll be able to resume his previous employment as a high-level construction manager (unable to walk uneven ground well, impaired concentration and ability to multi-task)."[84] On the same day, Dr. Steiner wrote a letter opining that Plaintiff "had been unable to work since a brain injury during his heart surgery in 2003. His functional capacity became worse following his recent stroke."[85]

On August 29, 2014, Plaintiff followed up with Dr. Martino. He reported feeling weak on the right side of his body and that he had lower energy and more difficulty with

_____

[82] A.R. 517–20.

[83] A.R. 463–64.

[84] A.R. 513–16.

[85] A.R. 497.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 20 of 46

headaches since his stroke.  He reported that his cognitive function had also decreased.  He also reported living in Fairbanks for a few months of the year and the rest of the year in Thailand.   On physical examination, Dr. Martino observed that Plaintiff had clear speech, but that he had "some word-finding problems and some mild dysfluency to his speech."   He observed that Plaintiff was "alert and oriented in all spheres," but that his "short-term memory was impaired and he was only able to remember one out of four words over five minutes."  Dr. Martino also noted that Plaintiff could reverse the spelling of the word "world" and reverse a five-digit sequence.   Dr. Martino also noted that Plaintiff's motor exam was normal, but his hand movements were "slow and clumsy bilaterally" with bilaterally weak hand grips at 4/5 strength.  He noted right arm and leg weakness at 4/5 strength; a slowed but "otherwise normal" gait; and a negative Romberg sign, but truncal swaying.  Dr. Martino opined that "the stroke caused significant short-term memory problems" and that Plaintiff was "certainly not able to return to his former occupation as a project manager."  He noted that it was "questionable whether he would be able to function in his former job at Home Depot as a salesperson."  Dr. Martino opined that Plaintiff was permanently disabled.[86]

On September 15, 2014, Plaintiff saw Dr. Steiner for follow up from his stroke.  He reported driving and better cognition.  He reported installing a retrofit chimney, with "lots of rest but installation was correct in sequence."   Dr. Steiner observed that Plaintiff

---

[86] A.R. 502–03.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 21 of 46

seemed "to be thinking well-enough, but [his] physical limits persist." He recommended using poles for stability and "doing puzzles."[87]

On January 16, 2015, Ron Feigin, M.D., a State agency reviewing physician, opined that as of the date last insured, Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk, or sit about six hours out of an eight-hour work day; and should avoid "even moderate exposure" to fumes, odors, dusts, gases, poor ventilation, and hazards. He also opined that although Plaintiff had understanding and memory limitations, he was not significantly limited in his ability to remember locations, work-like procedures, or understand very short and simple instructions. Dr. Feigin opined that Plaintiff was "moderately limited" in his ability to understand and remember detailed instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically caused symptoms; and to perform at a constant pace without an unreasonable number and length of rest periods. He noted that Plaintiff had "[d]eficits in higher executive functions" so he would "do best with simple, repetitive tasks."[88]

---

[87] A.R. 509–12.

[88] A.R. 89–92.

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 22 of 46

On January 22, 2015, Richard Smith, M.D., a State agency medical consultant, completed a Medical Consultant's Review of Physical Residual Functional Capacity Assessment. Dr. Smith noted that the "[c]urrent [medical evidence of record] documents a[ ] new ischemic [cerebral vascular accident] occurring on 5/30/14 and a more severe hemorrhagic CVA 6/8/14, which are however well after the DLI and irrelevant to the current claim." He opined that the RFC limitations were "consistent with the MER for the period under adjudication."[89]

On April 20, 2015, Dr. Steiner completed a disability impairment questionnaire. He diagnosed Plaintiff with cognitive deficits and stroke and described Plaintiff's symptoms as impaired cognition and easy fatigue. Dr. Steiner opined that Plaintiff could only sit, stand, or walk for one hour out of an eight-hour work day; could frequently lift up to ten pounds and occasionally carry up to ten pounds; occasionally lift up to twenty pounds; Plaintiff's symptoms would frequently interfere with attention and concentration during an eight-hour work day; and he would need to take breaks at least hourly.[90]

On October 29, 2015, Dr. Martino wrote a letter on Plaintiff's behalf. He opined that Plaintiff "cannot be gainfully employed because of his multiple strokes." Further, he opined that if Plaintiff "had full neuropsychiatric testing, it would disclose difficulties not only with memory, but difficulties with executive functioning which would make it very difficult for him to maintain employment." Dr. Martino also noted that "[s]ince [Plaintiff]

---

[89] A.R. 500–501.

[90] A.R. 545–49.

now has bilateral motor weakness, it is not practical for him to engage in a job which involves heavy labor.  This combined with his inability to do office-like work leaves Plaintiff without reasonable options."[91]

On September 26, 2016, Dr. Steiner wrote a letter on Plaintiff's behalf.  He reported that Plaintiff continued to have difficulty "keeping track of complex tasks, although the simple three- step task I gave him today he did well with."  Dr. Steiner opined that Plaintiff "lack[ed] the ability to maintain concentration and perform any job requiring complex tasking.  For example, when he worked at Home Depot as a sales associate, he could talk about materials because of his prior work experience, but could not tell patrons where to look for an item in the store, and could not work the cash registers well-enough to give patrons a refund."  He opined that Plaintiff was unable to perform a full-time job, as defined by Plaintiff's attorneys.[92]

On September 25, 2019, Dr. Steiner wrote a letter on Plaintiff's behalf.  He reported that Plaintiff "had an intraoperative stroke and a postoperative cardiac arrest which left him incapable of doing his work because of significant executive deficits [ ] ([i]mpaired memory and inability to perform necessary supervisory activities[)]."  Dr. Steiner opined that Plaintiff "remain[ed] permanently disabled by this."[93]

---

[91] A.R. 551.

[92] A.R. 22–23.

[93] A.R. 913.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 24 of 46

On September 26, 2019, Dr. Steiner wrote and signed an addendum to an unsigned and undated letter drafted in 2007. The undated letter summarizes Plaintiff's medical history from 1984 to 2007. In the addendum, Dr. Steiner wrote that, as of September 2019, "I continue to believe the conclusions on p. 18–19 of this report are true and valid." Dr. Steiner opined that Plaintiff's December 2003 explant heart surgery "caused permanent brain damages and heart injuries" to Plaintiff. He reported, based on his complete and comprehensive physical examinations of Plaintiff and conversations with Plaintiff and Plaintiff's wife, that Plaintiff had "lost the ability to perform multiple tasks on large constructions projects involving many sub-contractors which includes understanding and following complex engineering diagrams and building specifications." Dr. Steiner opined that Plaintiff would not be able to perform project management construction work in the future. He reported agreeing with Dr. Martino's medical opinions and conclusions.[94]

*Function Report*

On September 3, 2012, Plaintiff completed a function report. He reported that he read "various world news reports on the internet," fixed his own breakfast, showered, shaved, drove his daughter to school and other functions, worked on small house projects, volunteered with a NGO transporting patients to and from the hospital in Thailand, walked, barbecued, grocery shopped, called family, and watched television. He indicated that he was "quite nervous in crowds" and avoided "sporting events, shopping

---

[94] A.R. 914–31.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 25 of 46

malls, etc." He also reported that he "might get angry without good reason," could not "make complete sense with normal pace conversation," and that instructions became "jumbled." Plaintiff indicated that his impairments affected lifting, walking, squatting, stair-climbing, memory, completing tasks, concentration, understanding, and following instructions. He reported that he had to be "fairly heavily medicated against anxiety" for anything that restricted his ability to move around.[95]

*Written Statements*

On September 10, 2019, Plaintiff's wife, Connie R., provided a written statement of personal observations. She reported that Plaintiff would forget conversations, try to take notes to remember and then lose the notepad, and spend hours looking for "where he set his coffee cup." Connie R. reported that Plaintiff would "get directions exactly backwards, i.e., turning left instead of right" when driving.[96]

On September 16, 2019, Renee E., a former coworker, wrote a letter on Plaintiff's behalf. She reported that Plaintiff had been her immediate supervisor on projects for The Fluor Corporation and Tatitlek Alaska Native Corporation. Renee E. summarized her work history and reported that Plaintiff "changed when he returned from his surgery." She noted that Plaintiff began having trouble managing time, had trouble "grasping the magnitude of a problem," began neglecting basic and major work tasks, was "absolutely crippled by stress," and struggled with frustration and depression after his heart surgery.[97]

---

[95] A.R. 250–57.

[96] A.R. 868–69.

[97] A.R. 870–72. In addition to Renee E.'s letter, there are two more letter from work colleagues in

*Testimony on March 28, 2016*

On March 28, 2016, Plaintiff appeared and testified at a hearing before ALJ LaCara with attorney representation. Plaintiff testified that he volunteered with a mission organization in Thailand for about 15-20 hours per week primarily driving and fundraising, beginning in 2008. He also testified that he would send fundraising emails and drive to the Thailand border to pick people up. Plaintiff reported that in 2008 and 2009, he and his wife spent six months each year in Thailand. He testified that beginning in 2010, he and his wife spent eight and one-half months each year in Thailand. He indicated that he could "order lunch" in Thai, but he was "not even close to fluent" and could not "navigate a typical day in Thailand." Plaintiff reported that at the time of the hearing, he took Coumadin for his artificial heart valve and diazepam[98] "if I get amped up, but I don't take it very often." He testified that he was fired as project manager of a missile defense project in Shemya, Alaska in 2005 because he "couldn't keep all the balls in the air" and that "before I'd been exceptionally good at that." He also testified that after heart surgery in 2003 he was short-tempered, hard to get along with, and "wasn't organizing jobs like I did before my surgery."[99]

---

the record. These letters were submitted in 2007, before the relevant time period, and one was unsigned. The letters detail the negative changes Plaintiff's work colleagues observed in Plaintiff after his heart surgery and return to work in 2004. A.R. 873–87.

[98] Diazepam is used to treat anxiety, alcohol withdrawal, and seizures. *See https://www.webmd.com/drugs/2/drug-6306/diazepam-oral/details.*

[99] A.R. 63–75.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 27 of 46

Harvey Alpern testified as a medical expert. Dr. Alpern opined that Plaintiff had impairments during the relevant time period, but that they didn't "reach the level of listing until after" 2012. He opined that Plaintiff would have had a light RFC prior to June 2014 with occasional postural limitations; no ropes, ladders, heights or dangerous equipment; and environmental limitations because of a history of asthma. Dr. Alpern noted that cognitive impairments were "very common to see after aortic valve replacement with platelet showers" and "with subsequent cerebral vascular insufficiency to ischemic episodes, from—maybe from emboli." Dr. Alpern also noted that the "records suggest[ed]" impairments with Plaintiff's mental function prior to 2012.[100]

*Testimony on October 10, 2019*

On October 10, 2019, Plaintiff appeared and testified with representation before ALJ LaCara. He testified that he had worked at Home Depot "for about six months," but never learned to run the cash register. Plaintiff also testified that he had problems with concentration, trouble handling one or two items at a time, problems completing things, problems with ineffective speech, difficulties with attention span, problems interacting with people, and left-sided weakness.[101]

Joseph Gaeta, M.D., testified as the medical expert. He testified that he specialized in internal medicine and cardiovascular diseases. Dr. Gaeta testified that Plaintiff had had mental changes during the time period at issue, but "did not have any

---

[100] A.R. 52–54.

[101] A.R. 618–28.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 28 of 46

physical type of change." Specifically, when questioned by Plaintiff's attorney, Dr. Gaeta noted that a medical record in 2007 showed that Plaintiff's speech was whole; he had no deficits in memory; had normal coordination; and symmetrical reflexes. He agreed that Plaintiff was no longer able to perform the "very complex things that he did before," but stated that "[w]hether that makes him disabled is beyond my . . . expertise." Dr. Gaeta opined that Plaintiff could perform light work with limitations, including lifting 40 pounds occasionally and 10 pounds frequently; sitting, standing, or walking for six hours each in an eight-hour workday; never climbing ladders or scaffolds; and avoiding unprotected heights and moving machinery.[102]

Cheryl Buechner, Ph.D., testified as the psychological medical expert. She opined that Plaintiff had "some significant [neurocognitive] deficits compared to what could be assumed to be [Plaintiff]'s premorbid functioning" and opined that Plaintiff's mental functioning was "below average compared to the general population, but definitely with some measurable function impairment." She noted that Plaintiff "may have had some capacity to develop compensatory skills given the strength of the rest of his cognitive functioning, but I wouldn't expect that the deficit that he experienced relative to the premorbid function would entirely go away." Dr. Buechner also noted that the neurocognitive tests done in 2006 showed "significant marked deficit in pace" in relation to Plaintiff's own functioning and moderate deficits compared to the general population. She opined that Plaintiff's emotional regulation was adequate. She opined that Plaintiff

---

[102] A.R. 600–18.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 29 of 46

could not do his previous work, but he could perform simple, routine tasks that "could be very, very well learned."   Dr. Buechner also opined that Plaintiff's complaints were consistent during the January 2008 through December 2012 time period, "with trouble organizing his thoughts and word finding," but she didn't see "additional deterioration during that time period."[103]

Daniel LaBras testified as the vocational expert.   Based on the ALJ's first hypothetical[104], VE LaBras opined that Plaintiff would not be able to perform his past work. VE LaBras noted that "everything [Plaintiff] was doing was semiskilled or highly skilled" and "based on that alone," he concluded that Plaintiff's past work was eliminated.   VE LaBras opined that two extra 15–20 minute breaks in addition to regularly scheduled breaks would be considered "excessive break taking" and no full time jobs existed that would accommodate the two extra breaks.   He also opined that a person who could not maintain sufficient concentration, persistence or pace would not be able to work full time. VE LaBras opined that Plaintiff would have been able to perform work as a rental storage clerk.[105]

---

[103] A.R. 585–98.

[104] The ALJ's first hypothetical was as follows:

> [L]et's assume that we have an individual of the same age, education and work experience as that of [Plaintiff] and who is limited to light work with frequent climbing of ramps or stairs, no climbing of ladders, ropes or scaffolds, frequent balancing, stooping, kneeling, crouching and crawling.  This person is to avoid all unprotected heights and hazardous machinery.  This person is limited to simple, routine and repetitive tasks and no assembly line type work.  A.R. 631.

[105] A.R. 628–36.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 30 of 46

## IV.    DISCUSSION

Plaintiff is represented by counsel.  Both parties incorporate the arguments from their earlier briefs at Dockets 12, 13, and 14.[106]  In his opening briefs, Plaintiff alleges that the ALJ's decision was the product of reversible error of law and was not supported by substantial evidence because the ALJ: 1) failed to "comply with court-ordered terms of mandate, and the specific direction of the Appeals Council relating to the prior hearing recordings";[107] 2) failed to provide clear and convincing or specific and legitimate reasons for discounting Plaintiff's treating physicians' medical opinions; and 3) failed to provide clear and convincing reasons for discounting Plaintiff's symptom testimony.[108]  Plaintiff seeks remand for a de novo hearing and new decision.[109]  The Commissioner disputes Plaintiff's assertions.[110]  The Court addresses each of Plaintiff's assertions in turn:

A.  Prior Recordings

This Court's Order of July 20, 2020, at Docket 15, addresses the parties' arguments regarding the lost hearing transcript from November 2015.  Specifically, the hearing on November 2015 was continued by ALJ LaCara to March 28, 2016 to ensure "that all relevant medical evidence had been received."[111]  Additionally, the ALJ provided

---

[106] *See* Dockets 18, 19, 20.

[107] Dockets 12, 14.

[108] Docket 18 at 2–16.

[109] Docket 18 at 17.

[110] Docket 19 at 3–18.

[111] A.R. 27.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 31 of 46

Plaintiff with a hearing after remand on October 10, 2019.[112] The ALJ stated in her decision that the agency could not locate the recording of the November 2015 hearing.[113] Therefore, remanding again on the issue of the recording, after Plaintiff has already waited years for the administrative process, is not in the best interest of any of the parties.

B. Treating Physicians' Medical Opinions

Plaintiff contends that the ALJ did not provide legally sufficient reasons for discounting treating physicians Dr. Steiner's and Dr. Martino's medical opinions and evaluating specialist Dr. Leuchter's medical opinion.[114] The Commissioner argues that the ALJ reasonably weighed the competing medical opinions.[115]

1. *Legal Standard*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[116] Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither

---

[112] A.R. 555–70. *See* HALLEX I-2-6-46 ("If the entire hearing recording is missing or is completely inaudible . . . the ALJ must conduct a supplemental hearing to comply with 20 CFR 404.951 and 416.1451."); 20 C.F.R. § 404.951, 416.1451 ("The official record of your claim will contain all of the marked exhibits and a verbatim recording of all testimony offered at the hearing. It also will include any prior initial determinations or decisions on your claim.").

[113] A.R. 555.

[114] Docket 18 at 2–16.

[115] Docket 19 at 11–18.

[116] 20 C.F.R. §§ 404.1527(c), 416.927(c). These sections apply to claims filed before March 27, 2017.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 32 of 46

examine nor treat the claimant.[117] "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[118] In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[119] When "a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence."[120] This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."[121]

Factors relevant to evaluating any medical opinion include: (1) the examining or treating relationship; (2) the consistency of the medical opinion with the record as a whole; (3) the physician's area of specialization; (4) the supportability of the physician's opinion through relevant evidence; and (5) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[122]

---

[117] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

[118] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[119] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

[120] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[121] *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[122] 20 C.F.R. §§ 404.1513a(b), 416.913a(b), 404.1527(c)(2), 416.927(c)(2). These sections apply to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.614.

An ALJ may reject the opinion of a doctor "if that opinion is brief, conclusory, and inadequately supported by clinical findings."[123]

The opinions of agency physician consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source.[124] "The weight afforded a non-examining physician's testimony depends 'on the degree to which he provides supporting explanations for his opinions.'"[125] Greater weight may also be given to the opinion of a non-examining expert who testifies at a hearing because he is subject to cross examination.[126] The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.[127]

### 2. Dr. Martino

Dr. Martino treated Plaintiff from approximately 2007 through 2014. Based on his treatment, Dr. Martino opined in 2007 that Plaintiff was disabled due to brain dysfunction resulting from cardiac surgery.[128] Again, in 2015, Dr. Martino opined that Plaintiff "cannot be gainfully employed because of his multiple strokes." Further, he opined that if Plaintiff

---

[123] *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

[124] 20 C.F.R. §§ 404.1513a(b), 416.913a(b).

[125] *Garrison,* 759 F.3d at 1012.

[126] Andrews v. Shalala, 53 F.3d 1035, 1042 (citing Torres v. Secretary of H.H.S., 870 F.2d 742, 744 (1st Cir. 1989)).

[127] *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).

[128] A.R. 333.

"had full neuropsychiatric testing, it would disclose difficulties not only with memory, but difficulties with executive functioning which would make it very difficult for him to maintain employment." Dr. Martino also noted that "[s]ince [Plaintiff] now has bilateral motor weakness, it is not practical for him to engage in a job which involves heavy labor. This combined with his inability to do office-like work leaves Plaintiff without reasonable options."[129]

The ALJ gave Dr. Martino's medical opinions "little to no weight." She provided the following reasons: 1) Dr. Martino's work opinions were "inconsistent with the examination results . . . showing improvement in his physical functioning after the alleged onset date in this case;" 2) Dr. Martino's mental functioning opinion was inconsistent with the objective findings; and 3) Dr. Martino's hand-written treatment note in 2008 indicated that Plaintiff reported quitting his job at Home Depot "because there was nothing to do at [that] time of the year at Home Depot."[130] Testifying, non-examining Dr. Buechner's testimony that Plaintiff was capable of routine tasks that "could be very, very well learned" contradicts Dr. Martino's opinion that Plaintiff was disabled.[131] In light of Dr. Buechner's contrary opinion, the ALJ was required to provide specific and legitimate reasons for rejecting the medical opinions of Plaintiff's treating and examining physicians.[132]

_____

[129] A.R. 551.

[130] A.R. 564–65.

[131] A.R. 594.

[132] *Trevizo v. Berryhill,* 871 F.3d at 676 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)); *see also Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) ("[T]he reasons for

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 35 of 46

An ALJ may evaluate medical opinions based on their consistency with the record as a whole and may consider the improvement of symptoms with treatment.[133] However, observations of improvement "must be read in context of the overall diagnostic picture the provider draws."[134] In November 2007, a few months before the relevant time period, Dr. Martino opined that Plaintiff's executive function and left-sided weakness were unlikely to resolve and he was "vulnerable to deterioration in his neuropsychological functioning in the future."[135] However, the ALJ specifically noted treatment records by PA Rogers in October 2010 and August 2012 showed "no sensory loss or motor weakness, intact balance and gait, intact coordination, and normal motor skills."[136] The ALJ also pointed out Dr. Craig's finding, in February 2006, that Plaintiff's full scale IQ score was 121.[137]

An ALJ may discount a medical opinion that is inconsistent with the physician's own treatment notes.[138] Here, the ALJ noted the inconsistencies between Dr. Martino's disability opinions for the relevant time period and his September 16, 2008[139] treatment

---

rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion.").

[133] 20 C.F.R. § 404.1527(d)(4); *Orn v. Astrue,* 495 F.3d 625, 634 (9th Cir. 2007); *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).

[134] *Ghanim v. Colvin,* 763 F.3d 1154, 1161 (9th Cir. 2014) (internal citations and quotations omitted).

[135] A.R. 333.

[136] A.R. 342–51, 564.

[137] A.R. 564, 936.

[138] *Ghanim v. Colvin,* 763 F.3d 1154, 1161 (9th Cir. 2014) (internal citations and quotations omitted).

[139] Although the ALJ's decision cites September 16, 2018, the record she is referring to appears

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 36 of 46

notes showing Plaintiff had "clear speech, although he did stammer," that Plaintiff was "neatly dressed with no loosening of association or evidence of delusions," and he displayed a mildly depressed mood.[140] Additionally, the ALJ pointed to a handwritten note by Dr. Martino in 2008 that indicated Plaintiff reported quitting his Home Depot job "because there was nothing to do at [that] time of year at Home Depot."[141]

The Court's review of the medical records from the relevant January 2008 through December 2012 time period reveals that Plaintiff experienced some depression, some trouble organizing thoughts and stammering, but not disabling cognitive deficits.[142] Additionally, Dr. Martino's opinions about Plaintiff's cognitive and social functioning and ability to engage in employments also conflict with Plaintiff's reported activities during the time period. Specifically, Plaintiff's testimony from the 2016 hearing that he spent six to eight months each year in Thailand from 2008 to 2014 doing "charitable work," including driving people from the Thai border and fundraising primarily via email for a non-profit, charitable organization, conflicts with Dr. Martino's medical opinion that in 2007, Plaintiff

---

to be from September 16, 2008. On September 16, 2008, the record shows that Dr. Martino observed that Plaintiff appeared to be "mildly depressed." Dr. Martino observed that Plaintiff had clear speech, but he did stammer. Dr. Martino also noted that there was "no loosening of associations or evidence of delusions." A.R. 504, 564. Therefore, the Court rejects Plaintiff's argument that the ALJ's "extended reference to September 2018 is cherry picking because that incident is almost six full years after the December 2012 last insured." *See* Docket 18 at 10; Docket 19 at 14.

[140] A.R. 323, 564.

[141] A.R. 326, 564–65.

[142] *e. g.,* A.R. 323–27, 342–54.

was "totally and permanently disabled."[143] Although Dr. Martino opined that Plaintiff may have been "vulnerable to deterioration in his neuropsychological functioning in the future," the records during the relevant time period do not show deterioration.[144] Further, Dr. Buechner testified that she did not see evidence of "additional deterioration during [the 2008 through 2012] time period."[145]

Although Plaintiff's condition clearly deteriorated after May 30, 2014,[146] the ALJ provided specific and legitimate reasons for discounting Dr. Martino's disability opinions pertaining to the January 2008 through December 2012 time period.

### 3. *Dr. Steiner*

Dr. Steiner treated Plaintiff from 1984 through at least September 15, 2014.[147] He provided a lengthy statement and medical opinion of Plaintiff's condition as of 2007.[148] Dr. Steiner provided additional opinions in August 2014, April 2015, September 2016, and September 2019.[149]

---

[143] A.R. 56–60, 71–72, 323, 333.

[144] A.R. 323–27, 333, 342–54.

[145] A.R. 598.

[146] Dr. Alpern testified at the 2016 hearing that Plaintiff had "some impairments before [2012] but they don't reach the level of [a] listing until after [the date last insured]." A.R. 52. *See also* A.R. 373–459, 473–93, 500.

[147] A.R. 545, 914.

[148] A.R. 914–31. Dr. Steiner's statement was signed on September 26, 2019, but it provided a medical history through 2007 only. A.R. 931.

[149] A.R. 22–23, 497, 545–49, 913.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 38 of 46

The ALJ gave Dr. Steiner's medical opinions little to no weight.[150] As stated above, an ALJ may evaluate medical opinions based on their consistency with the record as a whole.[151] Here, the ALJ concluded that Dr. Steiner's opinions that Plaintiff was disabled were inconsistent with the objective findings. The ALJ again cited the October 2010 record with PA Rogers and the full-scale IQ score of 121 from Dr. Craig's 2006 evaluation.[152] In addition to the objective findings, the ALJ also addressed Dr. Steiner's treatment relationship with Plaintiff, the extent of the relationship, and the details of his medical opinions.[153]

In the Court's review of the record, there are no treatment notes pertaining to Plaintiff's mental deficits from Dr. Steiner during the relevant time period.[154] And, although Dr. Steiner opined that Plaintiff's mental deficits would preclude his past work as a project manager and that Plaintiff was no longer capable of complex task management or supervisory activities,[155] the RFC captures these deficits, during the relevant time period, by limiting work to "simple, routine and repetitive tasks and no assembly work."[156] For the reasons above, the ALJ's conclusion that Dr. Steiner's disability opinions were

---

[150] A.R. 565.

[151] 20 C.F.R. § 404.1527(d)(4); *Orn v. Astrue,* 495 F.3d 625, 634 (9th Cir. 2007).

[152] A.R. 565, 936.

[153] 20 C.F.R. § 404.1527(c) (evaluating opinion evidence for claims filed before March 27, 2017).

[154] A.R. 358, 362, 509, 513, 517.

[155] A.R. 497, 913, 931.

[156] A.R. 561.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 39 of 46

inconsistent with the objective findings is supported by substantial evidence in the record during the relevant time period.

### 4. Dr. Leuchter

Dr. Leuchter evaluated Plaintiff at his office at New York-Presbyterian Hospital on March 12, 2007. The ALJ gave little weight to Dr. Leuchter's neuropsychiatric evaluation and provided the following reasons: 1) Dr. Leuchter examined Plaintiff before the period at issue and 2) Dr. Leuchter's findings were not consistent with the objective findings during the period at issue.[157]

The Ninth Circuit has held that "[m]edical opinions that predate the alleged onset of disability are of limited relevance."[158] In this case, Dr. Leuchter's opinion was rendered approximately one year before the relevant time period and does not prove that Plaintiff's condition worsened from January 2008 through December 2012.[159] Additionally, there are very few records from the relevant time period.[160] The treatment notes that are in the record at that time describe Plaintiff's cognitive deficits as mild and show his depression and anxiety were largely controlled.[161]

---

[157] A.R. 565–66.

[158] *Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1165 (9th Cir. 2008).

[159] A.R. 907–11.

[160] At the March 28, 2016 hearing, the ALJ noted that, although there were references in the record to treatment records from Thailand during the relevant time period, the records were not added to the SSA file. A.R. 49–50. *See also* 342, 345, 347–51.

[161] A.R. 323–27, 342–54.

Case 4:20-cv-00003-TMB   Document 21   Filed 11/17/20   Page 40 of 46

Dr. Leuchter opined that Plaintiff's cognitive deficits were "significant and likely permanent." He recommended cognitive remediation therapy.[162]   Although the ALJ discounted Dr. Luechter's medical opinion in the decision, the ALJ included Dr. Leuchter's work limitations.   Specifically, the ALJ included Dr. Leuchter's opinion that Plaintiff's cognitive deficits "preclude[d] [Plaintiff] working as a project manager which requires sustained attention, switching of attention, planning, strategizing, and executing" in the RFC by limiting Plaintiff to "simple, routine and repetitive tasks and no assembly line type work."[163]   Therefore, any error in discounting Dr. Leuchter's work limitations was harmless.[164]

In sum, to the extent the ALJ rejected Dr. Leuchter's medical opinion, the ALJ provided specific and legitimate reasons that were supported by substantial evidence.

C. Symptom Testimony

Plaintiff asserts that the ALJ's rejection of Plaintiff's symptom testimony "failed to satisfy the clear and convincing standard."[165]   The Commissioner contends that the ALJ

---

[162] A.R. 907–911.

[163] A.R. 561, 911.

[164] *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1055–56 (9th Cir. 2006) (An ALJ errors in social security cases are harmless if they are "inconsequential to the ultimate nondisability determination" and "a reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.").

[165] Docket 18 at 6.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 41 of 46

"considered Plaintiff's alleged symptoms and provided specific and legitimate reasons supported by substantial evidence for discounting them."[166]

Credibility determinations are the province of the ALJ.[167]  An ALJ engages in a two-step analysis to determine the credibility of a claimant's testimony regarding subjective pain or symptoms.[168]  In the first step, the claimant "need not show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom."[169]  On this point, the ALJ determined that Plaintiff's mild cognitive disorder and cardiovascular insult to the brain were severe impairments.[170]

In the second step, the ALJ evaluates the intensity and persistence of a claimant's symptoms by considering "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how [the claimant's] symptoms affect him."[171]  If a claimant meets the first test and there is no evidence of malingering, the ALJ may reject testimony regarding the claimant's subjective pain or the intensity of symptoms, but must provide "specific, clear and

_____

[166] Docket 19 at 4–5.

[167] *Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989).

[168] *Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014); *Treichler v. Comm'r of Soc. Sec. Admin.,* 775 F.3d 1090, 1102 (9th Cir. 2014).

[169] *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (*superseded by statute,* 20 C.F.R. §§ 404.1529 (c)(3), 416.929 (c)(3), *effective for claims before March 27, 2017*).

[170] A.R. 557.

[171] 20 C.F.R. §§ 404.1529(a), 416.929(a) (text of subsection for claims before March 27, 2017).

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 42 of 46

convincing reasons for doing so."[172]   The ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines [that] testimony"; general findings are insufficient.[173]   An ALJ may consider at least the following factors when weighing the claimant's credibility: claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between his testimony and his conduct, claimant's daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.[174]   If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.[175]

Here, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence.   The ALJ rejected Plaintiff's testimony because she found that Plaintiff's "physical functioning improved during the period at issue."[176]   An ALJ may discount a claimant's symptom testimony if the claimant's symptoms improved with treatment.[177]   The ALJ cited treatment notes showing that although Plaintiff had signs of

---

[172] *Smolen,* 80 F.3d at 1281; *Ghanim v. Colvin,* 763 F.3d 1154, 1163 (9th Cir. 2014).

[173] *Treichler,* 775 F.3d at 1102 (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)).

[174] *Thomas v. Barnhart,* 278 F.3d 947, 958–59 (9th Cir. 2002) (internal quotations and citations omitted).

[175] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

[176] A.R. 562.

[177] *Morgan v. Comm'r, Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999).

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 43 of 46

neurological weakness on the left side, the signs "did not significantly limit [Plaintiff]'s overall mobility." She cited examinations during the relevant time period showing "no sensory loss or motor weakness, intact balance and gait, intact coordination, and normal motor skills."[178]

Next, the ALJ found that the objective findings during the period at issue did not establish that Plaintiff's deficits in social and cognitive functioning were as severe as alleged. The ALJ cited treatment notes in 2007 and 2008 showing that Plaintiff had clear speech without dysarthria or aphasia and that Plaintiff was "mildly depressed" and "somewhat anxious."[179] The ALJ also pointed to Dr. Martino's treatment note from January 2008 in which Plaintiff reported quitting his job at Home Depot "because there was nothing to do at [that] time of year at Home Depot."[180] Although an ALJ "may not reject the claimant's statements regarding [his] limitations merely because they are not supported by objective evidence," the treatment records during the period at issue, read as a whole, undermine Plaintiff's testimony that he was only able to pay attention for five minutes even without distractions, could not concentrate, couldn't complete a conversation in public, couldn't control his anger, needed help and reminders to take medications, and followed spoken instructions "very poorly."[181]

Further, the ALJ determined Plaintiff's activities during the period at issue

---

[178] A.R. 323–27, 342–54, 562.

[179] A.R. 328, 335–41, 563.

[180] A.R. 326, 563.

[181] A.R. 323–27, 342–51, 563, 621–25.

"suggest[ed] largely intact social and cognitive functioning."[182] An ALJ may discount a claimant's credibility when daily activities demonstrate an inconsistency between what the claimant can do and the degree of disability alleged.[183] Here, the ALJ provided a detailed description of Plaintiff's activities that contradicted his testimony regarding his social and cognitive functioning. The ALJ pointed out Plaintiff's travel and volunteer activities in Thailand during the relevant time period, including fundraising, learning Thai, and driving refugees to and from the hospital in Chiang Mai, Thailand.[184] The ALJ also noted that Plaintiff's reported daily activities included reading world news reports, often driving his wife and daughter to do errands and to school and other functions, helping with laundry, doing most household repairs, and traveling with NGO workers to refugee areas to "just be friendly and encouraging."[185]

In sum, the ALJ provided specific, clear, and convincing reasons supported by substantial evidence for discounting Plaintiff's testimony.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were free from legal error and supported by substantial evidence in the

---

[182] A.R. 563.

[183] *Molina v. Astrue,* 674 F.3d 1104, 1112–13 (9th Cir. 2012).

[184] A.R. 57–60, 250, 564; *see also Tommasetti v. Astrue,* 533 F.3d 1035, 1040 (9th Cir. 2008) (the ALJ discounted Tommasetti's testimony "about the extent of his pain and limitations based on his ability to travel to Venezuela for an extended time to care for an ailing sister.").

[185] A.R. 250, 564.

Case No. 4:20-cv-00003-TMB
Decision and Order
Page 45 of 46

record.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Dockets 12

and 18 is **DENIED** and the Commissioner's final decision is **AFFIRMED**.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 17th day of November, 2020 at Anchorage, Alaska.


*/s/ Timothy M. Burgess*
UNITED STATES DISTRICT JUDGE